Young and Johnson versus VP. We hear from Mr. Clark. Good morning, your honors, and may it please the court. I'm Jeff Clark here on behalf of VP. The district court decision in this case cannot stand. It's flawed as a matter of the basic contract formation issue that it resolved, and it's also even more flawed. We think inexplicably flawed on the issue of how Judge Barbier dealt with the question of whether there was fraud in the inducement. I want to cover both of those points. I think I'll stand on the briefs on the issue about the bond, especially the concession from the other side. And while I want to cover our three main arguments, our argument about contract, no contract formation, our argument about condition on payment, and our argument about fraud in the inducement, let me try to do something maybe a little bit non-conventional to start with and cut right to the heart of what I think will show you that there was an error here below. That's if you would take a look at page 1572 in the record, which is where the release appears. And what you'll see is that that release provides in identical language that appears in the protocol document issued by the GCCF and the rules document issued by the GCCF in the release, and that's on page 1572, four times an FAQ document in the determination letter as well, that all claimants have a right to consult with an attorney of their own choosing prior to accepting any settlement or signing a release of legal rights. That makes absolutely clear that the legal theory in which the lower court accepted and that Mr. Johnson's counsel advanced his flaw, because if you look at the release document and all those other sources, they tell you that once the claimant gets the release, the claimant can look at the release and decide that they're not going to accept the deal, and at that point there's no contract. By contrast, Mr. Johnson's theory is that a contract was formed at a much earlier time based on some preliminary documentation letter exchange that went between him and the GCCF. That theory is flatly inconsistent with what the release tells you. You're saying no mutuality? No mutuality, that's correct, Your Honor. And that issue was one that I think that the other district court judge who looked at this in the Southern District of Texas, you know, fully accepted in the decision where he reached the opposite conclusion. The release document where this language appears that allows the claimant explicitly to decide, and there's language that says on page 1575, do not sign unless you understand and agree. So you must, that's the point at which a contract is formed when that occurs. Prior to that time, there's no contract, and the release document was the single most important document, the single most heavily reviewed document. It was reviewed by the Obama Administration's Justice Department. Indeed, it assigned its number three official, the Associate Attorney General of the United States, to dog the release essentially and make sure that it was sufficiently protective of claimant rights and that no one could be railroaded into a deal. Let me ask you something. You know, there are probably hundreds, maybe thousands of cases settled in the district courts across the circuit where the day before trial or while the jury's being selected or whatever, counsel agree on the settlement, and so they tell the judge, Judge, we've settled this case, and what the lawyers agree to is how much it's going to be paid, and of course they're going to sign the release documents. Now, in those cases, do you think that either side, let's say the plaintiff, when he gets the release documents, he'd come in and say, Judge, this release is too broad. I'm not going to agree to this. We didn't make a deal until I read that release. Is that going to be the argument? Is that going to prevail? Your Honor, I'm going to argue to you as I did the last time that I appeared in front of you when this case was that this is a distinguishable situation, and BP is not asking for the court to threaten those kinds of situations, you know, run-of-the-mill situations where there's a settlement, as we discussed on the courthouse steps, where there's a specific settlement and then sort of a lease to follow as a ministerial term. This context is incredibly different, and I would submit to you that it is sui generis q. It's a situation in which the Justice Department, 1,440 commenters, the ABA, they reviewed the GCCF process in and out, and they set up the ground rules for how settlements would occur in this situation. So even if it were correct, and I think there's, you know, all of the cases say that this is a question of context, so they're entirely consistent with this theory, but even if it were correct that, you know, 99 percent of maritime cases were settled in this way, where first there was a settlement and then there was a release to follow, that doesn't apply to this situation. This situation is entirely different. It's a situation in which, you know, it was designed for this very large oil spill, and it was a highly reticulated process that the Justice Department and all the commenters and Ken Feinberg and his law firm built specifically for this process. It is a purpose-built process. It lays groundwork and rules that cannot be ignored, and under those rules, no contract is formed until the actual release is signed in this context. It didn't offer the law of contracts, though, and they sent this, BP's authorized agent sent this letter out that's got offer all over it. I mean, I could count the number of times, but you know probably better than I do how many times it says, we offer. If you sign and accept after 14 days, you can get your check. I mean, that's about as firm an offer as I know how to make. Two points about that, Your Honor. First of all, there's a lot of case law that indicates that there is no magic words approach to that. The fact that they use offer acceptance verbiage isn't sufficient to form a contract, and we've cited the cases on that in our brief. And second, one of the premises of Your Honor's question was that there was a, you know, that the GCCF was BP's agent. In fact, that's not true. The contract specifically provides, in Section 10, it says independent contractor, no agency. So, it was set up specifically for the GCCF to be an agency. So, they were authorized to settle cases, were they not? They were authorized to settle cases, Your Honor, consistent with a set of ground rules which they adopted and published, and under those ground rules and what the document states, what the release document states, what the protocol states, is that you cannot even accept an offer unless you sign the release. So, it provides a specific context, and those rules, if they're violated, then the, you know, to the extent there would be any agency relationship, it would be voided because at that point, the GCCF would be operating outside of its legal mandate. Well, I mean, the point is they were authorized to make settlements and authorized to make settlement offers. That's correct, Your Honor, in the sense of as bound by the rules. So, in an ordinary context, if there were a lawyer, right, the, you know, lawyer has a kind of, you know, general agency for their client, and it's not a common situation in which there would be a published set of rules about what your lawyer kinds of offers your lawyer can accept and how we used to go about that acceptance. That's what makes this particular context unique, and even more than that, it's clear both from the legal opinion that Ken Feinberg got from former Attorney General Michael Mukasey and from Professor Gillers, the noted ethical expert, that he was not being set up as a lawyer for BP, and he wasn't bound by any of those duties. Instead, he was set up as a quasi-adjudicator, as a private neutral to resolve cases in the fashion of the way a judge would resolve cases. He wasn't bound to what BP told him to do. Instead, BP was bound by what he decided to do, and in this instance, at another level, that really the beginning and end of this process, which is very much like an administrative law process, was that Ken Feinberg would act on these claims, and under the OPA process, which inspired this entire GCCF, look at 33 U.S.C. 2713, it indicates that the whole design of this OPA-inspired process was to keep cases out of court, to resolve them extra-judicially. This is the only case we are aware of that involves an attempt to essentially seek judicial review of what the GCCF did, and that exception of it shows sort of how very unusual this case is. The GCCF was supposed to reach decisions that were final and unreviewable. Here, it reached a final decision that Mr. Johnson's claims were based on fabrication, and on that basis, it rejected them. That should be the end of the story. I thought the review process came within 14 days after the offer letter went out. Your Honor, it's true that there was a 14-day window for BP to appeal in, and that BP did not appeal in that window. However, it did not have the evidence during that 14-day period of time. We think Judge Barbier's ruling to the contrary has no basis. He provides no citation to the record for it. The evidence about fraud didn't come in until October 20th, after the appeal window had already closed. Well, to me, that relates to your fraud case, and not to whether a contract was formed. Your Honor, I'm sorry, I don't understand your question. You're saying you don't know if you can prove fraud, then you've got something else, but otherwise, I don't see why you don't have a contract. Well, Your Honor, we respectfully disagree, but that's probably a good point for me to shift and segue into the fraudulent inducement point. So, there was clearly sufficient evidence here of a dispute of material fact about whether there was fraud in forming this contract. In the February 2011 letter that Ken Feinberg sent, the final determination, he said, basically, we proceeded thinking that this was a claim in good faith. We got information from Tidewater that we launched an internal investigation out through the eminent investigation firm, Guidepost, and we learned from that that these claims were fraudulent, and on that basis, we denied them. And so, from that perspective, clearly, there is sufficient evidence for a trial, potentially, on the question of whether there was fraudulent inducement, but in this unique context, Your Honors, I would urge you to actually hold that that shouldn't even be the standard, because the point is not whether, you know, Ken Feinberg, he wasn't making a conclusive determination of whether there was fraud or not. He essentially just decided that there was sufficient evidence of fabrication of these claims that he was going to deny any GCCF- based relief to Mr. Johnson. That did not strip any legal rights from Mr. Johnson. He had a pending claim in the MDL. He still has that pending claim in the MDL. He can get that claim fully heard and resolved. So, in this administrative law-like process in which Congress has specifically decided that it's not supposed to be subject to judicial review, this is a situation in which even the issue of fraud, we don't have to assume the burden of showing you that there actually was fraud, although we think that the Guidepost report, you know, thoroughly shows that.  There was, quote, no credible evidence that Mr. Johnson was injured in the way that he sat. There's also one crewman who said that he asked Mr. Johnson whether he was injured, and he said, no, I wasn't injured. And then Mr. Johnson said, but I'm going to get some money from Tidewater. And then the other crewman said, well, how are you going to get money from him if you're not injured? And, you know, Mr. Johnson replied, I'm all shooken up, something like that. So, you'll find that all in the Guidepost report. You'll also find the statements from one of the able-bodied enginemen, Louis Langlois, who stated that, quote, Johnson was not hit by any door, that he was not thrown, did not fall, did not lose consciousness, and at no point did he witness Johnson strike his head, lose consciousness, or in any way injure himself. Well, let me ask you something. You, if you were the judge, and you were going to fashion a test for when fraud would enable somebody to go back in and reopen one of these claims, what would your test be, bearing in mind that it needs to be very, like, very carefully, what would your test be? Judge King, I think there would be, there's a very easy way to accomplish that in this case, which is that Mr. Johnson argues that once the determination letter was sent out, and he accepted that in the election form, that at that point a contract was locked in, and that therefore the GCCF had a duty to send him the release. However, our argument, and I think this is the easy way that the court could rule, is that between the time that that happened and the time that the GCCF made a final decision, that's when they got the evidence that his claim was fabricated. And so on that basis, under well-accepted law about what Mr. Johnson asserts is the doctrine of preemption, there's an exception to the doctrine of preemption, which is prevention, which is that it does not require the sending, in this case of whatever the next step is, here a release, in a situation where it, you know, it's not improperly withholding the release. It was not improper for Ken Feinberg to withhold this release once he had that evidence of fraud. He was subject to and actually was audited by the Justice Department and the BDO consulting firm. Under Mr. Johnson's theory, it's really unthinkable. Once Ken Feinberg got the evidence that there was fraud, he was supposed to just sit back and take no action on that and send out 2.7 million dollars of money that he had a fiduciary duty under his contract to see that he notes that he has a fiduciary duty to BP. There, once he got that evidence of fraud, I think the easy, cleanest way, if that were the issue that the court were attracted to ruling on, would be to say that in this instance, the contract formation was cut off by virtue of the fact that it was not improper to withhold the release once the evidence of fraud arose. Okay. All right. Thank you very much. Let me reserve the remainder of my time for a moment. Thank you, Your Honors. Mr. Aitken. May it please the Court, Corey Aitken for Elton Johnson. I think the appropriate place to start discussing this case is the standard of review. I think we win the case, even under the de novo standard, but BP has no chance to win the case under the correct abuse of discretion standard. In fact, they don't even argue the district judge abuses discretion to the extent he had discretion. They just say there's a fact issue. In this case, in motion, this Court, in motions to enforce settlement agreements, has regularly said that the abuse of discretion standard applies. In fact, just two months ago, in the Sundown Energy v. Holler case, that's at 773 F3rd 606, it's a December 2014 case, this Court said, and I quote, We review a district court's decision to enforce a settlement agreement for an abuse of discretion. A district court abuses its discretion if it, one, relies on clearly erroneous factual findings, two, relies on erroneous conclusions of law, or three, misapplies the law to the facts. Any factual determinations the district court makes when deciding whether to enforce a settlement agreement are subject to the clear error standard. And this Court's applied that standard over and over again in cases dealing with summary judgments, or excuse me, dealing with motions to enforce settlement agreements. That's why BP wants to argue that this is actually a summary judgment motion, because they know they can't win under that abuse of discretion standard. Getting to the merits of the actual contract, I think Judge Davis hit the nail on the head. This is no different than any other contract, any other settlement agreement that is regularly entered into. And Judge Barbier hit the nail on the head when he said that a party can't undo a binding agreement by simply refusing to sign the release. I do have a question about the media. Yes. What if all of a sudden BP said – I mean Mr. Johnson said I don't want to go forward with this. I don't want to release all these other people. I was willing to release BP, but I am not willing to release my employer or any of these other people. Could the court compel him to sign that release? The court could compel him to sign the release and has compelled him to sign the release. And courts have compelled people to sign the release in similar cases. In the circumstance you mentioned, Judge Owen, signing the release is a contractual obligation that Johnson assumed when he accepted the offer on September 24th. If he refused to sign the release, he wouldn't get paid, not because the contract wasn't – Well, he says I didn't consult the lawyer. I didn't realize that I would have to release all these other people. And now I've consulted the lawyer, and it says I have the right to, and I don't want to go forward. Could the court still compel him to sign it? Absolutely. The court could do it with specific performance or some other possible remedies. BP would have no obligation to pay him at that point because Johnson would be in breach of the agreement he reached. Could BP compel him to sign the release even though he didn't have counsel? Yes, Your Honor, and there are several cases cited in our brief where a seaman – even a seaman is – specific performance to sign a release is ordered against him. There's one interesting case. It is the Amway case that we cited in our brief where the – this court ordered the defendant to – or ordered the plaintiff to essentially cash the settlement check that the defendant was trying to send when the seaman was trying to back out the settlement. This determination letter had a general description of the parties to be released, didn't it? It did. In fact, it was as broad as could be. The offer letter said he has to release everybody who is potentially responsible. All PRPs. Excuse me? All PRPs, potentially responsible parties. That's absolutely right, and obviously Tidewater, the plaintiff's employer, Jones Act employer, would be a potentially responsible party. He had sued him in the underlying tort case, but – and the other party for that matter as well. And there's evidence in the record that Johnson was willing, ready, and able and wanted to put an end – to sign that release and wanted to put an end to his lawsuit in exchange for the money, and that was the deal that he had struck. And the offer letter of September 23rd clearly says we're going to offer you this amount of money if you promise to release BP and any other potentially responsible party. Why do you say the argument that this is not the ordinary case because of all the GCCF background? Sure. Respectfully, I disagree. I mean this is a normal Jones Act case, but even in the context of BP being sued by a lot of people as a result of this oil spill. This court sent this case specifically to Judge Barbier because he has knowledge of how the GCCF worked, because he managed the underlying tort case, and he's overseen this litigation since its inception in April 2010. And Judge Barbier looked at this and has looked at the GCCF and a lot of these other opinions prior in its management of the MDL. Judge Barbier looked at this and said, listen, this is – normal contract principles apply, normal settlement agreement principles apply, and this was a deal. And he certainly didn't use his discretion in finding that. It wasn't a purely erroneous fact-finding. And that's how I'd answer it. The normal rules of settlement, normal rules of contract formation don't change simply because it's a big event or a small event. Was GCCF – what is the document that gave GCCF authority to settle a claim on behalf of BP? So the contract between BP and the GCCF specifically says in exchange for – the payment ended up being about $1.2 million a month. The GCCF was authorized to settle claims, including personal injury claims, made against BP. I mean it is express authority. In fact – and then when – I mean the offer letter, the September 23rd offer letter is from the GCCF saying we're acting on behalf of BP. Now this was not a unique letter that was sent to Elton Johnson. This was sent to thousands of other claimants as a form letter with the number change. BP had seen that letter over and over again. After this – after Johnson accepted this settlement agreement, BP ratified their action. I mean I think they had expressed authority to get into action, but BP ratified it. Their own attorneys said over and over again in correspondence, this is a settlement. This is a deal. We acknowledge we have a right to appeal it. We have 14 days to appeal it, but we are going to refuse to. This occurred when Tidewater's – Tidewater, the Jones Act employer in the case, wrote BP asking them to blow up the deal because Tidewater didn't – Tidewater owed indemnity, and Tidewater didn't want to pay that indemnity to BP. Talk to me a little bit about what BP used about what they now say is a fraud allegation before the 14-day window passed. According to BP's reply brief, page – I believe it's 25 of their reply brief – they say, I quote, Tidewater conducted its interviews – BP was not involved – on October 3rd through 5th, 2011. So according to BP, Tidewater is interviewing these crew members to, in my view, gene up a fraud defense to blow up the settlement between October 3rd and 5th. Why is the October 3rd through 5th timeline important? The October 3rd through 5th timeline is important because during the same time, BP's attorneys at their law firm and Tidewater's attorneys are engaged in a flurry of phone calls and emails. My question to you is what does the record show that BP used about the circumstances of the accident or his medical situation, anything, before their 14-day window passed? As far as the medical? No, no, no. I'm talking about – The fraud allegations. Alleged – facts of the alleged accident and his medical. Start with the facts of the accident. Sure. I mean BP was obviously well aware of the facts of the Deepwater Horizon accident and the banks and – No, no, no. How Johnson got hurt, if he did? They had several medical records with patient histories. The medical records were – you know, the medical records would say I was on the bank soon, I was thrown during the explosion, here's what my symptoms are, things of that nature. They had MRIs. Did they have any of the statements of the Tidewater personnel? Judge Barbee implicitly – Did BP, according to the record, have any of those statements? There is no direct evidence, but certainly very strong circumstantial evidence that they did, Your Honor. Well, what's in the record that would support what you just said? That's what I was getting to with this October 3rd through 5th timeline. Tidewater's conducting these interviews with its employees between October 3rd through 5th. When does the deadline run, 14 days? October, I believe, 9th or 10th, or I believe the 9th. And during that time, Tidewater's lawyers and BP's lawyers are on the phone every day, emailing every day. That's in the record. About this case? About this case, about this settlement. BP had told Tidewater we've settled the case, we want you to indemnify us, and Tidewater kept writing back saying exercise your 14-day period of appeal, your right to appeal within the 14-day time period. And it defies belief that while Tidewater's trying to blow up this deal, and corresponding with BP, and interviewing these employees during the same October 3rd through 5th time period, that they're not also telling BP, hey, guess what my witnesses said the other day, guess what my crew members said the other day. Yeah, but you say it defies belief, but it's not in the record? The fact that the conversations are occurring is not in the record. The fact that Tidewater actually tells BP's counsel that this is what our witnesses say is not directly in the record. Tidewater's counsel says we believe we have very strong defenses available, we believe this settlement's unreasonable given the strong defenses, and they're talking all the time while Tidewater's counsel is interviewing these people. So Judge Barbier found that Tidewater – that BP must have known, but even if he didn't, BP – I mean this is a case that had been in litigation for some time. BP had the opportunity to take depositions. BP had the opportunity to send discovery. In fact, in BP's reply brief, they seem to imply that this case was stayed. That argument wasn't made to Judge Barbier and certainly would have surprised him because pretrial order 17, which is record document 740 in the MDL, had said that depositions are scheduled to begin on January 18th, 2011. But in July 2011, BP deposed nine of my other personal injury claims about their injuries. This settlement goes forward with Johnson two months after those other depositions took place. So BP certainly had the opportunity to discover its case against Johnson. It just simply chose not to. But Judge Barbier's fact-finding that there was no fraud, particularly when the GCCF investigative report even says he didn't submit a fraudulent document. The report said it was a good indication this guy faked his accident. BP's interviews looked at them closely. BP had put their best foot forward in front of Judge Barbier advocating this. It was the main basis of their brief. What the actual interviews show is these people say, we didn't see him get hurt that day. He didn't report the injury until the next day. And then you have a stack of medical records which show objective tests of injuries. You have more than that. You've got one man who says, you know, I was with him and this didn't happen to him while I was there. And somebody else says, look, that deck of the tidewater boat was covered with mud and he had fallen on it when I covered it up with mud and he didn't have any mud on him. He worked normally the next day. You know, reported to everybody that he was okay, he wasn't hurt. You know, they've got all that too. Well, I don't think the record actually goes that far when you read the witness statements. There are doubts cast on this story by some of these crew members who, by the way, are controlled by a party who owes a $2.7 million indemnity obligation. And whether – and the fact is Judge Barbier has – it's a factual finding that he made. Those witnesses have never testified, though, have they? They did not testify, but as noted by the U.S. Supreme Court in Anderson v. City of Bessemer – that's a 470 U.S. 564 – the clearly erroneous abuse of discretion finding for fact finding doesn't just apply to testimony. It applies to documents that the district court gets to review, affidavits, things of that nature. And for whatever reason, Judge Barbier found that the claims of fraud by Tidewater and by BP simply didn't hold water. I think it's absolutely correct finding, but you don't need to agree to affirm. You just need to find he didn't clearly abuse his discretion in making that finding, and with the reams of evidence that is in the record that shows this is not a fraud claim, that's an easy finding to make. That's why BP is trying to get you to apply the de novo standard. But I think that talking about the fraud allegations in a little bit more detail, besides the factual basis for them, I think there are legal reasons why that argument failed. I think it's kind of the difference between the intrinsic versus extrinsic fraud and the inducement. This is – there is case law that says when a party tries to set aside a settlement agreement for fraudulent inducement, they can't. It needs to be the type of fraud where, for instance, BP had said we are going to pay you $2.7 million, but instead they really never intended to pay $2.7 million. They intended to put their company in bankruptcy to prevent the plaintiff from collecting this money. The cases say that that would be fraud. If you can't couch the underlying tort litigation as fraudulent, settle a case, and then say my case is now stronger because I have these witness statements, that's not the type of fraud that can be used to set aside a settlement agreement. There are also cases that say that Johnson and BP are not in a fiduciary relationship. They're not business partners. They're adversaries in litigation locked in combat. You don't – you're supposed to check out these allegations, try and do everything you can to decrease the value of the claim. And a party can't justifiably rely on another party's allegations. One of the interesting facts, of course, when Johnson filed his personal injury action, BP denied the allegations that he was hurt. They said we, as an affirmative defense, our negligence didn't cause any injuries, and we deny he has injuries. I mean right there they're not relying on anything he says. But putting aside these kind of technical reasons why they don't meet the elements of fraud, and below BP didn't even try to meet any of the elements of fraud. Putting that aside, there was no fraud here. This is – I mean you've got one judge that thinks if somebody lies about whether they had an accident or not to get someone to get him a settlement. That's the kind of fraud that will upset a settlement agreement. Well, in fairness, Your Honor, I agree. But that's not what happened here. My argument may have been a little too technical, but that is not what happened here, Your Honor. This is a case where BP decided it was easier to fight with Johnson than it was with their business partner. So they latched onto this argument to try and blow up the settlement. There's a clear deal. Judge Bardi, again, uses discretion in finding there was no fraud. And unless you have any other questions. Okay. Thank you very much. Thank you. Okay, Mr. Clark, back to you. Thank you, Justice. So I have a lot to respond to, but I think I can do it hopefully. Let me start with the point that the standard of review here is one of abuse of discretion. That's not true. We, in the briefs, I think thoroughly deconstruct the CAF Anon case, which was the primary case that they cited. It doesn't stand for the proposition that they argue that it stands for. And then, Your Honor, Judge Davis, you'll recall the Mid-South case that you raised the first time the Elton Johnson case was brought forward to you. And in that decision, it specifically says that the motion to enforce was brought in a summary judgment posture. And there was a remand, essentially, for a fact finding where there was a material dispute of fact. So that is the proper posture. That's the posture that controls under Rule 56. And there's no specialized law that creates a different standard for enforcing settlements when the dispute is, was a settlement even formed? If one is formed and there's some kind of argument that equitably it shouldn't be enforced or something like that, that kind of resolution by a district court would be subject to abuse of discretion review. But here there's a fundamental disagreement about whether a settlement was formed in the first place. Second, Judge Owen was asking the question about whether Mr. Johnson could be compelled to sign a remand. And absolutely, positively, he could not. In the kinds of situations that Judge Davis was talking about, perhaps an order like that would lie, where there was a clear deal and then the ministerial release to follow. Here it was clear ex ante, before anything kicked off with Mr. Johnson or any claimants, that in order to accept, they had to sign the release and that all the terms, you know, basic concepts of the release were out there. And the release specifically says don't sign this release if you don't agree with it. So it can't possibly be the situation that with that known ex ante there could be a court order to sign it. Third is the issue of choice of law, which just continues to show that while Mr. Johnson said he wouldn't even sign a release, he's inherently at war with it. He sued initially under Louisiana law for his tort case. Then when he brought his breach of contract case, he sued under Texas law. Then when Judge Barbier erroneously decided that maritime law controlled, they switched their theory to maritime law controlling, and all of that's contrary to the release because the release actually specifies that it's controlled by the law of the state of residency of the claimant here, Louisiana. And so that is the actual situation for that, and it shows that Mr. Johnson has not accepted all material terms of the contract. Fourth, you know, Judge Davis and Judge King, you were asking some questions about the GCCF process and how that fit with who are responsible parties. And the OPA statute, which talks about responsible parties, is indeed informed by the surplus statute that preceded it that uses the term potentially responsible parties. Potentially isn't a term that appears in OPA, though, and actually that's the point that BP was making, that here the question of who is a responsible party is quite narrow. And if you look at the two-page list of tiny font released parties, you'll see that it lists dozens and dozens of parties who are not responsible parties under the OPA statute, which inspired this process, which again is to say that you couldn't have known about that material term until you looked at the release and had the chance to review it. Mr. Johnson, I mean, Mr. Johnson's counsel was trying to make the argument that this is an ordinary contract case, you should ignore the GCCF. But all of the contract authorities say that whether contracts are formed, how you analyze contract questions, are controlled by context. Here, the context is highly clear. There are lots of cases where there are particularized disputes of fact, but here it was all laid out ex-ante in a process that was scrutinized thoroughly by the Justice Department, by the ABA, among others. Mr. Johnson argues that BP ratified the contract. But if you look at page 1337 of the record, you'll see that that can't possibly be the case because it specifically provides that none of the decisions or methodologies applied by Feinberg Rosen, the GCCF, in connection with making these decisions, shall not be deemed endorsed or concurred in by BP. Also, there's a general exception to ratification doctrine that says if you're not in possession of the material facts, you can't have been deemed to ratify. Here, BP didn't get the evidence of fraud until later. That is probably a good place to turn to Judge Davis's questions about what did BP know. And the record does not reflect, as Mr. Johnson's counsel was forced to concede, that BP actually had the information before the appeal window closed. And, indeed, there's an even better point on that. If you look at page 1276 of the record, you'll see the brief that Johnson filed below where he specifically concedes that Tidewater did not raise the issue of fraud until after it launched its first two theories inside the appeal window with BP, which were, as Johnson puts it, that they didn't have procedural rights, that they thought that this was possibly for gross negligence, and they hadn't signed up to that. It didn't mention any arguments about fraud. There is no record evidence that Mr. Esbrook ever heard about fraud. The letters don't reflect that. There are no other documents. Your Honor, if I could continue with a couple more points before concluding. I'm going to take a couple minutes. Thank you, Your Honor. And then there was the point that Mr. Johnson's counsel raised that the MDL issues here were not state. Your Honor, this is a vast case, and you know that the focus has been, from other cases before you, on various settlements. There's just an OPA test trial process, which is kind of in its nascent stages. But there's been no litigation of any—and the United States claim is very far advanced, the claim for civil penalties. But there has been no individualized adjudication by Judge Barbier in particular cases. So the notion that this case was going through some kind of intensive litigation is as false as the notion that the GCCF was engaged in a negotiation with Mr. Johnson as opposed to— I would assume that some of the settlements have been challenged, and there have been hundreds of these settlements. The judge must know how the cases are routinely handled. That's correct, Your Honor. Someone is a class member, either of the economic laws class or the medical class. There have been disputes about that, and there have been some individualized appeals that are starting to reach you. But Mr. Johnson isn't a class member. He doesn't fit into either class. And so his case is in the large bucket of cases in the vast hundreds of thousands of people in the MDL that is, in fact, state. There's an argument about the fact that BP also must have recognized or endorsed this settlement in some form based on a case from the District of Wyoming, and then based on Mr. Itkin's distinction between intrinsic and extrinsic fraud. If you look at that District of Wyoming case, what you're going to see is that it really says that this is a solid case in which there was clearly a settlement agreement, and, indeed, it was res judicata because it had been ruled by the courts twice to be a settlement agreement. I'm glad you're honest. I thought you just had a couple of things to say. In closing, Your Honor, let me just say this. This case was properly interrupted during the GCCF process before the error could be consummated, before the money could be sent out the door. What Mr. Johnson wants to do is undo that and recreate the error, and the court should refuse that intervening. Thanks a lot. Thank you, gentlemen. We have your case.